UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

        -against-

CORY MONROE,

                              Defendant.
------------------------------------------------------------x

**MEMORANDUM AND ORDER**

08-CR-609 (ENV)

**VITALIANO, D.J.**

Defendant Cory Monroe is charged by indictment with one count of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The charge stems from the recovery of a firearm from Monroe's person during a search by officers of the New York City Police Department ("NYPD") on the evening of July 31, 2008. Presently before the Court is Monroe's motion to suppress the recovered firearm and his post-arrest statements, on the ground that they were obtained in violation of the Fourth Amendment. An evidentiary hearing was held on May 29, 2009. For the reasons that follow, Monroe's motion is denied.

## I. BACKGROUND

On July 31, 2008, NYPD Officers Kieran Fox, Kevin Brennan, and Christian Delacruz were members of the Brooklyn North Borough Anti-Crime Unit, a command that then assisted various Brooklyn precincts experiencing increases in violent crime.[1] The officers were on-duty and on patrol in plain clothes in an unmarked vehicle within the 73rd Precinct, an area of Brooklyn the officers understood to be suffering from high levels of violent crime. Officer Fox

---

[1] As of the date of Monroe's arrest, Officer Fox had served with the NYPD for 19 ½ years and had been a member of the Brooklyn North Borough Anti-Crime Unit for three years; Officer Brennan had just under four years of experience with the NYPD and about four months with the Anti-Crime Unit; and Officer Delacruz had been an NYPD officer for nearly five years and had been with the Anti-Crime Unit for about five months.

was driving the car, Officer Brennan was sitting in the front passenger seat, and Officer Delacruz was seated in the back behind Officer Fox.

At approximately 10 p.m., the officers responded to a series of police radio calls reporting a large dispute, possibly involving a firearm, in the vicinity of Union Street between Ralph Avenue and Portal Street. As the officers arrived on scene, they observed the crowd referenced in the calls as it began to disperse. A summary of the officers' relevant suppression hearing testimony follows.

### A.  **Officer Fox's Testimony**

Officer Fox testified that the location of the reported disturbance was an area he had patrolled frequently and was known to him for its high levels of violent crime. Shortly after arrival, Fox observed a "very agitated" man -- not the defendant -- in conversation with a female companion. (Transcript of May 29, 2009 Suppression Hearing ("Tr.") at 13.) The officer heard the man insist that he was "not taking that" and that he was "coming back," while the woman attempted to calm him down. (Id.) Officer Fox inferred from this that the reported dispute likely was not over, and began canvassing the area by car.

About 45 minutes later, while still canvassing, Officer Fox observed a group of 10 to 15 men crossing East New York Avenue and walking south on Ralph Avenue "at a pretty high rate of speed." (Id.) The group appeared to be following the lead of a single person who walked in front and who, Fox noted, frequently kept pulling up his pants. This individual, the "leader of the pack", according to Officer Fox, was the defendant. (Id. at 15.)

The officers began following the group as it traveled south down Ralph Avenue in the direction of Sutter Avenue. About halfway down the block, Officer Fox heard people shout warnings to the group identifying the plainclothes officers as members of NYPD and alerting the

group that they were being followed. Upon reaching Sutter Avenue, the group turned left towards Union Street and the officers continued to follow.

Eventually, the group approached the corner of Sutter Avenue and Union Street, a location Officer Fox testified suffers from a "high, high rate of gang activity." (Id. at 17.) As the group reached the corner, Officer Fox observed that its members fanned out into a line and he heard someone yell "here they come." (Id. at 17-18.) According to the officer, bystanders began to flee from the group, a woman grabbed a young child and hid behind a parked car, while others scattered and ran for cover in a nearby park. These reactions led Officer Fox to believe that someone in the group likely had a gun and that there was a danger that shots would be fired. At this point, Fox reassessed the behavior he had earlier observed of Monroe, namely, the repeated pulling up of the pants, and concluded that he was the one carrying the firearm. (Id. at 28.) As these events unfolded, Officer Fox commented incredulously to his fellow officers "I don't believe they're going to do this right in front of us." (Id. at 18.)

Officer Fox testified that Monroe made eye contact with him and proceeded to walk north on Union Street. Believing he "need[ed] to talk to this guy, stop him," to avoid an altercation, the officer decided to continue pursuing Monroe and the group. (Id. at 19.) However, because Union Street is a narrow street and runs one-way south, Officer Fox testified that he decided not to follow the group north, against the flow of traffic, and risk becoming stymied. Instead, the officers drove around the block -- driving east on Sutter Avenue, north on Tapscott Street, and west on East New York Avenue -- in an effort to regain contact with the group at the next intersection. Upon reaching that intersection -- Union Street and East New York Avenue -- Officer Fox again observed Monroe walking north on Union Street, now accompanied by only three other individuals.

As the smaller group reached the corner of Union Street and East New York Avenue, Officer Fox, still seated within the unmarked vehicle, identified himself as a police officer and asked the four men to stop. The group complied and Officers Brennan and Delacruz exited the car and began to talk to the men. Officer Fox testified that he believed his fellow officers were "talking a little politely," an approach with which he disagreed. (Id. at 21.) Officer Fox got out of the car and drew his firearm, holding the weapon at his right hip with the barrel facing the ground. He instructed Monroe to get against the wall, but the defendant initially did not comply. Officer Fox gave the order a second time, telling Monroe to "[g]et against the fucking wall." (Id. at 22.) Monroe backed up against the wall and Fox holstered his weapon.

With the defendant facing him, Officer Fox quickly checked Monroe's front waistband and pockets and then spun him around so that the defendant was facing the wall with his hands up. The officer double-checked Monroe's front and then began to pat down his back, starting with his upper body and moving downward. As Officer Fox approached Monroe's back pockets, the defendant began to move his hands downward off of the wall. Fox instructed Monroe to keep his hands up and the defendant initially complied. As the officer resumed the pat-down, he noticed that Monroe's right back pocket contained an object, although he could not determine whether it was a firearm. At this point, Monroe again attempted to move his hands downward and Officer Fox responded by pinning the defendant to the wall with his left shoulder. He then proceeded to pat Monroe's back pockets, discovering, when he reached the right back pocket, what felt like the sight, barrel, handle, and trigger guard of a gun. Officer Fox handcuffed Monroe and then removed a loaded .22 caliber revolver from the defendant's right back pocket.

B. **Officer Brennan's Testimony**

Officer Brennan testified that upon arriving at the scene, he saw a man -- not the

defendant -- arguing angrily with a woman and yelling "I'm coming back with it, I'm coming back with it." (Id. at 70-71.) Brennan stated that the three officers then remained in the area in their car to observe the crowd disperse. A short time later, Officer Brennan observed a group of approximately six men, including Monroe, turn right onto Ralph Avenue and quickly walk south towards Sutter Avenue "as if they were on a mission." (Id. at 71.) The officers followed.

About half to three-quarters of the way down Ralph Avenue between East New York Avenue and Sutter Avenue, the group of six encountered and began to argue loudly with another group. Officer Brennan testified that bystanders began to gather their children and things and hurry inside and out of the way of the original group. About this time, Brennan recalled that the arguing groups noticed the unmarked car and realized that they were being observed by police officers. Officer Brennan testified that it was at this point that Officer Fox commented that the men they were watching were going to shoot it out right in front of them.

Instead, however, near the corner of Ralph Avenue and Sutter Avenue, the second group broke off the altercation and went inside a nearby building. Two members of the original group also split off, while four men, including the defendant, turned left onto Sutter Avenue and began walking towards Union Street. At this point, Officer Brennan began to notice that Monroe kept pulling up his pants in a fashion that led the officer to believe that he was carrying a gun. This behavior continued as Monroe and the now-smaller group reached the corner of Sutter Avenue and Union Street and turned left -- north -- onto Union.

The officers now drove around the block and stopped the four men near the corner of East New York Avenue and Union Street. Officer Brennan testified that during the stop, he was responsible for watching one of the members of the group other than the defendant. However, he observed Officer Fox telling Monroe to keep his hands up because he kept lowering them, and

5

ultimately saw Officer Fox handcuff the defendant.

C. **Officer Delacruz's Testimony**

Officer Delacruz testified that upon arrival, he and the other officers began canvassing the area. Approximately 20 to 30 minutes later, Delacruz spotted a group of six or seven men, including Monroe, walking south on Ralph Avenue towards Sutter Avenue, behaving in a disorderly fashion and discussing a fight. The officer testified that the defendant in particular appeared nervous and kept adjusting his pants. Officer Delacruz observed that Monroe had an unidentified heavy object in his back pocket, which he repeatedly touched as he walked down the street.

Officer Delacruz testified that as the group proceeded down Ralph Avenue, bystanders began to move away from the group and indoors. Delacruz stated that it was around this time that one of the members of the group noticed the officers and shouted to the others that they were being followed by the police. The officers continued to follow the group as it turned left onto Sutter Avenue and walked east. At the corner of Sutter Avenue and Union Street, the original group encountered a second group and, according to Officer Delacruz, a tense standoff ensued. The officer testified that he believed a shootout was about to occur. Delacruz recalled thinking that the defendant in particular had a weapon because the object in his back pocket formed an L-shape and appeared to weigh down his pants.

Eventually, the groups separated, and Monroe and three members of the original group headed north on Union Street. The officers drove around the block and approached the group near the corner of Union Street and East New York Avenue. Officer Delacruz testified that the officers asked the men to stop and when they complied, he exited the police vehicle and began to ask them questions. He observed that Monroe moved toward the back of the group, did not

make eye contact, did not speak to the officers, and continued to adjust his pants. Delacruz testified that at one point, the defendant turned his body in a way that revealed an L-shaped bulge in his back pocket. Officer Delacruz, who was standing near Officer Fox as he patted down the defendant, observed Monroe move his arms down during the pat-down, saw Fox eventually handcuff Monroe, and witnessed him removing a gun from the defendant's back pocket.

## II. DISCUSSION

Monroe argues that the gun seized from his person should be suppressed because the detention and search that led to its recovery violated the Fourth Amendment. Specifically, he contends that (1) it was unlawful for the officers to stop and frisk him because they lacked a reasonable suspicion that he had or was about to commit a crime, Terry v. Ohio, 392 U.S. 1 (1968); and (2) even if a Terry stop had been permissible, the officers used unreasonable force in conducting it, raising the police action to the level of an arrest that, in the absence of probable cause, was illegal.[2]

### A. The Basis for the Stop and Frisk

#### 1. Applicable Law

Under Terry, a police officer may briefly detain an individual for questioning if the officer has "a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity." United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991); see also Arizona v. Johnson, 129 S. Ct. 781, 784 (2009). "A Terry stop represents an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest." United States v. Elmore, 482 F.3d 172, 178 (2d Cir.

---

[2] Monroe also argues that his post-arrest statements should be suppressed as fruit of the allegedly unlawful detention. Because he advances no argument as to the admissibility of these statements that is independent of his attack on the lawfulness of the street search and seizure, the Court does not treat separately this branch of the motion.

7

2007). Accordingly, the amount of suspicion needed to justify such a stop "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Id. at 179.

To determine whether reasonable suspicion exists to support an investigative stop, a court must look to the "'totality of the circumstances' to see whether the officer had a 'particularized and objective basis' to suspect criminal activity." United States v. Padilla, 548 F.3d 179, 187 (2d Cir. 2008) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). The officer conducting the stop "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" Padilla, 548 F.3d at 187 (quoting Terry, 392 U.S. at 21). While the officer may not rely on an "inchoate and unparticularized suspicion or hunch, . . . he is entitled to draw on his own experience and specialized training to make inferences from and deductions about the cumulative information available to him that might well elude an untrained person." Id. (internal quotations omitted); United States v. Muhammad, 463 F.3d 115, 121 (2d Cir. 2006); United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000) (courts must evaluate the totality of the circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training").

Once an individual has been lawfully stopped pursuant to Terry, the investigating officer may conduct a pat-down search for concealed weapons if "he has reason to believe that the detained individual is armed and dangerous." Padilla, 548 F.3d at 187 (citing Terry, 392 U.S. at 24); see also Johnson, 129 S. Ct. at 784. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." Adams v. Williams, 407 U.S. 143, 146 (1972); Terry, 392 U.S. at 24.

2. **Analysis**

Monroe argues that the officers' decision to stop and frisk him was based on a inarticulable hunch, rather than reasonable suspicion, and therefore cannot satisfy Fourth Amendment strictures. His primary contentions in this regard are that the testimony of the three officers is inconsistent and that Officer Fox's statements in particular lack credibility. On the other side, the government, to justify the intrusion, asserts that the testimony adduced at the hearing was consistent in all material respects and amounts, in its totality, to a showing of reasonable suspicion.

The Court agrees in this case that the testimony of the three officers is both credible and supports the conclusion that the stop and frisk of the defendant was permissible. The officers testified to a number of factors that, when taken together, created a reasonable suspicion that Monroe was committing the crime of carrying a concealed weapon.[3] First, Officer Fox testified that the location of the Terry stop -- an area he had patrolled frequently and with which he was quite familiar -- was known for its high crime, including violent crime. Moreover, the officer stated that the corner of Union Street and Sutter Avenue, through which Monroe and his group passed and, according to Fox and Delacruz, lingered in a confrontation, was particularly notorious. While these considerations, alone, are certainly not sufficient to justify a stop, they properly factor into an officer's reasonable suspicion calculation. Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (recognizing, as a relevant contextual consideration, the fact that the stop occurred in a "high crime area"); Padilla, 548 F.3d at 188; see generally Arvizu, 534 U.S. at 276.

Second, Monroe's behavior, as described by each of the officers, supported the decision

---

[3] In fact, the testimony makes clear that the officers had reasonable suspicion -- sufficient to justify a Terry stop -- to believe that Monroe was about to engage in other criminal activity, as well. See N.Y. Penal Law § 120.06 (criminalizing "gang assault" caused, *inter alia*, by a person "aided by two or more persons actually present").

9

to make an investigative stop. Following their arrival at the scene of the reported disturbance, the officers began to follow a group of men that included the defendant. According to Officer Fox, the group was walking very quickly; Officer Brennan noted that that they were walking as if they were on a mission; and Officer Delacruz described the men as acting disorderly and stated that they were discussing a fight. All three officers testified that the group became involved in a tense confrontation with another group that two of the officers -- Fox and Delacruz -- believed was sufficiently serious that it might escalate into a shootout, notwithstanding the fact that the participants knew they were being observed by NYPD officers.[4] Moreover, each officer stated that he saw Monroe repeatedly pull up his pants, as if, concluded Officers Brennan and Delacruz, they were weighed down by a heavy object. Indeed, all three officers eventually determined, in light of their other observations, that Monroe kept pulling up his pants because they were weighed down by a firearm.

Third, the reaction of bystanders to the presence of Monroe's group militates strongly in favor of the officers' stop. Each officer testified that other people on the street fled from the defendant's group as it made its way through the neighborhood: Officer Fox testified that he witnessed a woman grab a young child and hide behind a parked car, and that other individuals scattered and ran for cover in a nearby park; Officer Brennan stated that he saw people gather their things and move themselves and their children indoors; and Officer Delacruz also testified to an exodus from the street into nearby buildings as the group approached. These reactions, from residents of a neighborhood the officers recognized as a tough one, properly could be considered by them in determining whether to approach the defendant. Arvizu, 534 U.S. at 276 (police officers are entitled to assess a situation in light of their training and familiarity with the

---

[4] Indeed, one could infer that the reason the confrontation did not immediately escalate was precisely because the groups were aware of the presence of the observing officers.

area and its inhabitants); see Holeman v. City of New London, 425 F.3d 184, 190 (2d Cir. 2005).

It is almost too basic to point out, of course, that several of these elements the officers identified -- for instance, the defendant's repeated pulling up of his pants -- without anything more, could not justify the sort of governmental intrusion that followed in this case. But it is also fundamental that such otherwise innocuous behavior could, in "the eyes of a reasonable and cautious police officer . . . guided by his experience and training," combine with other factors to form the basis for a lawful investigative stop. Bayless, 201 F.3d at 133-34; Padilla, 548 F.3d at 187 (holding that "[e]ven conduct that is 'as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity'") (quoting Villegas, 928 F.2d at 516); see Terry, 392 U.S. at 22 (recognizing that a "series of acts, each of them perhaps innocent in itself," can, when "taken together[,] warrant[] further investigation"). Here, several factors, alone as consistent with innocence as with guilt -- Monroe's presence in a high crime neighborhood; his walking quickly, as if on a mission; the repeated pulling up of his pants -- merged together and with conduct tending to suggest an imminent threat of illegality -- the confrontation with the second group and the frightened reactions of bystanders. The totality of these circumstances, as observed by the officers on the scene and articulated by them at the hearing, raised a reasonable suspicion of wrongdoing that permitted the officers to stop the defendant. See Padilla, 548 F.3d at 189 (affirming denial of suppression of handgun where officer observed the defendant surreptitiously following a man in a high-crime neighborhood with which the officer was familiar, and making otherwise innocuous motions consistent with the adjustment of a concealed weapon).

Furthermore, because the officers had reason to believe, based on their observations, that Monroe was armed and dangerous, they were entitled to pat him down once they initiated the

stop. See, e.g., id. Upon a determination, during the pat-down, that Monroe's back pocket contained a hard object in the shape of a weapon, and bolstered by the defendant's repeated efforts to move his hands down before his back pocket could be patted, Officer Fox had probable cause to remove the object from Monroe's pocket. Terry, 392 U.S. 29-31. When the object was revealed to be a firearm, the officers then had sufficient grounds to place Monroe under arrest.

In opposition to this chain of reasoning, Monroe argues that the officers' testimony was inconsistent, thus undermining their assertion of reasonable suspicion. It is true, as far as it goes, that the officers' precise recollection of the events of July 31, 2008 differed. For instance, Officers Brennan and Delacruz testified that bystanders ran from Monroe's group on Ralph Street, while Officer Fox stated that they fled later, near the corner of Union and Sutter. When it came to identifying the location of the confrontation between the defendant's group and the second group, the officers' memories aligned in a slightly different pattern: Officers Fox and Delacruz pointed to the Union Street-Sutter Avenue corner, while Officer Brennan stated that the altercation occurred earlier, on Ralph. Officer Fox also saw a larger group of men with Monroe (about 10 to 15 individuals) than the other officers reported (six or seven).

The Courts finds, after observing the demeanor and listening to the testimony of each of the officers, that these discrepancies are not indicative of any attempt to deceive and do not materially undercut the essential facts that add to reasonable suspicion. All three officers agreed that the area they were patrolling was known for its high levels of violent crime. All three testified that the group of men Monroe was walking with generated suspicion. Specifically, and importantly, all stated that the defendant's group was involved in a tense confrontation with another group and all testified that the group provoked frightened reactions from neighborhood residents -- indeed, caused people to flee -- as it approached. And, all three officers observed

Monroe repeatedly pulling up his pants in a manner that led each of them to conclude that he was carrying a gun. Monroe's arguments notwithstanding, the officers' statements simply are not marred by the sort of glaring incompatibilities that would suggest to the Court that the essential elements of their testimony should not be believed. The Court concludes that the evidence adduced by the government satisfies its burden to justify the stop and search of the defendant.[5]

### B. The Officers' Use of Force

#### 1. Applicable Law

A permissible investigative stop supported by reasonable suspicion nevertheless "may become an unlawful arrest if the means of detention are 'more intrusive than necessary.'" United States v. Tehrani, 49 F.3d 54, 61 (2d Cir. 1995) (quoting United States v. Perea, 986 F.2d 633, 644 (2d Cir. 1993)). In order to determine whether a Terry stop is sufficiently intrusive to ripen into a *de facto* arrest, a court must look to:

> the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, and the physical treatment of the suspect, including whether handcuffs were used.

Perea, 986 F.2d at 645 (internal citations omitted).

#### 2. Analysis

Monroe contends that the officers used such force in conducting the stop and frisk that it effectively converted the police action into an arrest for which there was no probable cause. Monroe premises his argument on the contention that the need for force in effecting the stop was

---

[5] The Court is aware, and takes quite seriously, the finding of the Chief Judge of this Court in a separate matter that the testimony of Officer Fox in that case was not credible. However, upon a searching evaluation of the officer's testimony at the hearing in this matter, and for the reasons articulated above, the Court concludes that Officer Fox's statements under oath here are believable and support the determination that the stop and frisk of the defendant was lawful.

low. According to the defendant, the observations of Officers Brennan and Delacruz did not support the exercise of anything beyond minimal force, while the recollections of Officer Fox, which might otherwise have justified greater efforts, are not credible. Therefore, Monroe claims, the actions Officer Fox took to detain him and perform the protective search -- pulling his gun, ordering Monroe against the wall, and pinning him there -- exceeded what was reasonable under the circumstances.

This argument is without any merit. As the Court has already held, Officer Fox's testimony is credible and supports the decision to conduct the Terry stop and frisk. Likewise, his and the other officers' reasonable belief that Monroe was carrying a concealed weapon entitled them to "take necessary measures to neutralize the threat without converting a reasonable stop into a *de facto* arrest." United States v. Newton, 369 F.3d 659, 674 (2d Cir. 2004) (internal quotations omitted). And the steps they took were, in fact, reasonable under the circumstances, as illuminated by the Perea factors. Three officers briefly detained a group of four men, at least one of whom, again, the officers reasonably suspected was armed and dangerous. Officer Fox unholstered his weapon but kept it by his side with the barrel facing downward and never pointed it at anyone. See, e.g., id.; United States v. Alexander, 907 F.2d 269, 273 (2d Cir. 1990). It was within Officer Fox's discretion to order the defendant into a position -- against the wall -- that facilitated the pat-down. Nor was it remotely unreasonable for the officer to apply limited force in the midst of the protective search after Monroe repeatedly made attempts to lower his hands whenever the officer neared his right back pocket. Finally, Officer Fox did not handcuff the defendant until after the pat-down revealed a heavy object in the shape of a gun, giving the officer probable cause to seize the weapon and make the arrest. This limited use of force was entirely reasonable, the Court concludes, and, therefore, did not run afoul of Monroe's Fourth

14

Amendment protections.

## III. **CONCLUSION**

For the foregoing reasons, Monroe's motion to suppress the firearm and his post-arrest statements is denied.

SO ORDERED.

Dated: Brooklyn, New York
November 2, 2009

ERIC N. VITALIANO
United States District Judge